Joshua B. Swigart (SBN 225557)
Josh@SwigartLawGroup.com
Noah J. Larsh (SBN 348541)
Noah@SwigartLawGroup.com
**Swigart Law Group, APC**
2221 Camino del Rio S, Ste 308
San Diego, CA 92108
P: 866-219-3343

Daniel G. Shay (SBN 250548)
Dan@ShayLegal.com
**Shay Legal, APC**
2221 Camino del Rio S, Ste 308
San Diego, CA 92108
P: 619-222-7429

*Attorneys for Plaintiff and The Putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMY WRIGHT, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TRUECARE PROPERTY HOLDINGS, LLC,<br><br>Defendant. | Case No: 25-cv-00786-JES-BLM<br><br>CLASS ACTION<br><br>**FIRST AMENDED COMPLAINT**<br><br>**1. Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)**<br>**2. Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631**<br>**3. Invasion of Privacy Under California's Constitution**<br>**4. Use of a Pen Register or Trap and Trace Device, Cal. Penal Code § 638.51**<br>**5. Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56.06, 56.10, 56.101**<br><br>**Jury Trial Demanded** |

## INTRODUCTION

1. Plaintiff Amy Wright ("Plaintiff") brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant TrueCare Property Holdings, LLC ("TrueCare" or "Defendant"). This action is based upon personal knowledge of the facts pertaining to Plaintiff, and on information and belief as to all other matters, stemming from the investigation of the undersigned counsel.

## NATURE OF THE ACTION

2. Plaintiff brings this action against Defendant for procuring and aiding Meta Platforms, Inc. ("Meta") to intercept communications containing confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") via a tracking pixel ("Meta Pixel") in violation of various common and statutory data privacy laws.

3. Defendant maintains the website: https://www.truecare.org/ (the "Website"), that provides healthcare information and assistance to consumers in San Diego and Riverside Counties[1].

4. When Class Members enter their details on Defendant's website, safeguarding their personal health information is paramount. Users anticipate that their data will remain confidential and will not be intercepted by third parties. This expectation is particularly significant when involving sensitive issues such as mental and reproductive health. These subjects involve deeply personal details, including medical histories and experiences, detailed and revealed by searches involving these medical subjects. The emotionally sensitive and potentially stigmatizing nature of this information underscores the critical importance of robust data protection measures to maintain user trust and ensure privacy.

[1] https://truecare.org/about/

5. Moreover, information concerning an individual's healthcare is protected by state and federal law such as the Confidentiality of Medical Information Act ("CMIA") and the Health Insurance Portability and Accountability Act ("HIPAA").

6. Despite these protections, and unbeknownst to Plaintiff and Class Members, Defendant procured and aided Meta to access its Website visitors' personal information by installing the "Meta Pixel" on its site, which is a JavaScript code that, once installed on a webpage, allows Meta to intercept users' communications with a site.

7. The Meta Pixel intercepts and sends information to Meta in a data packet containing PII, which Meta then stores on its own servers.

8. The information that Defendant aids Meta to intercept includes the consumer's unique Facebook ID ("FID") and the pages that the person visited, among other information. A consumer's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the consumer.

9. The Pixel allows Meta to collect the FID and page visits together in a single transmission. Because the FID uniquely identifies an individual's Facebook account, Meta, as well as any other person, can use the FID to quickly and easily locate, access, and view that person's corresponding Facebook profile. In simplest terms, the Meta Pixel enables Meta to know what mental health conditions, or other serious health concerns, its member searched and viewed on Defendant's website.

10. The Private Information that Defendant aids Meta to obtain through the Meta Pixel is valuable to internet marketing companies like Meta as they receive, view, analyze, and aggregate the information to build consumer profiles to assist advertisers in targeting desired demographics, for commercial gain.

11. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

///

## PARTIES

12. Plaintiff Amy Wright is a natural person and an adult citizen of the state of California, domiciled in San Diego County, California.

13. Defendant is a limited liability company formed in California with its principal place of business located in California. Defendant operates, among other things, the Website, that is the subject of this litigation.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises out of Defendant's violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §2510 et seq.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims.

16. This Court has personal jurisdiction over Defendant because Defendant is a company formed in California with its principal place of business in California. The events and conduct giving rise to Plaintiff's claims occurred in California, within this judicial district. The violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of California, such as Plaintiff, while they were located within California. At all relevant times, Defendant did business with residents of California, including Plaintiff. Defendant also conducts business within the State of California by maintaining "18 state-of-the-art health centers and 5 WIC . . . offices conveniently located throughout Southern California."[2]

17. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business within this judicial district at all times relevant.

///

///

[2] https://truecare.org/locations/

## FACTUAL ALLEGATIONS

### A. COMMON ALLEGATIONS

18. Defendant's Website allows visitors to seek information about various health conditions and potential treatments. It also allows visitors to enter information and match with doctors and physicians who can evaluate them and provide them with recommended treatments for the conditions they enter on the site[3].

19. When Plaintiff and Class Members searched, navigated, and viewed pages on Defendant's Website, including those related to health conditions, Defendant aided Meta to intercept the communications, which are "GET requests" or "POST requests" containing the information, through use of the Meta Pixel.

20. The information Defendant procured and aided Meta to intercept included the specific medical information selected or entered, searches, and pages viewed by Class Members, as well as their FIDs.

21. Anyone who possesses an FID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile by simply visiting www.facebook.com/[the user's FID].

22. Facebook profiles typically identify the user by name and contain large amounts of personal information, including the user's current location, picture, name, gender, place of residence, career, education, religious preferences, political affiliations, personal interests, family members, a multitude of photos, and the content of the user's posts. The posts often go even deeper and can indicate a user's position on specific hot button topics like gun control, abortion, or immigration for example.

23. Just as Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of a FID. Thus, equipped with a FID and the URL of the pages that were viewed on Defendant's Website, any ordinary person could determine the identity of the Website visitor and the specific health conditions they viewed on Defendant's Website.

[3] https://truecare.org/providers/

24. Defendant aids Meta to obtain the Class Member's FID, searches performed and pages visited in a single transmission through use of the Meta Pixel.

25. The Meta Pixel is an advertising tool that allows Meta to track visitor actions on websites. The websites use the Pixel in hopes of better targeting of advertisement for their products and services on Facebook to interested consumers. Thus, businesses, such as Defendant, choose to install the Pixel to increase profits.

26. According to Meta's website, the Meta Pixel allows it "to match your website visitors to their respective Facebook User accounts" and that "[o]nce matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."[4]

27. Defendant knew that by installing the Meta Pixel on its Website, Meta would intercept information identifying Website visitors, their searches, information they selected or entered and the pages they visited.

28. Meta's website explains that, to begin using the Meta Pixel, a business must first "install" the Pixel "by placing the Meta Pixel base code on all pages of your website."[5] Defendant made the conscious decision to undertake this installation process.

29. Meta benefits from websites like Defendant's installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta owned platforms, like Instagram. In addition, even if the business does not advertise with Facebook, the Pixel assists Meta in building more fulsome profiles of its users, which in turn allows Meta to profit from selling more targeted ads. The Pixel is installed on a variety of websites and, accordingly, provides Meta with diverse information about its users' preferences, distinguishing traits, and web browsing activities outside of Meta-owned platforms.

---

[4] https://developers.facebook.com/docs/meta-pixel/get-started
[5] Id

30. Through Defendant's use of the Meta Pixel, Meta is able to intercept communications and learn the searches Class Members enter on Defendant's site and the pages they visit, together with their FIDs, thus linking their health conditions to their Facebook profiles and their identities.

31. Plaintiff and Class Members were completely unaware that Meta had access to their information.

32. At no point was Plaintiff, or any other Class Member, asked for consent to such access.

33. Defendant procured and aided Meta to intercept communications containing the Private Information of Plaintiff and Class Members, including their health conditions, which they reasonably expected would be kept private.

**1. GET And POST Requests**

34. A GET request is an HTTP method used by a web browser or application to retrieve specific information from a server. It is commonly employed when a consumer enters a search term, clicks a link, selects an option, navigates to a particular page, or otherwise interacts with a website's interface.

35. The purpose of a GET request is to send a request to the server, which then returns the requested resource, such as a webpage or data. Importantly, the data label sent via a GET request is appended to the URL in plain text, making it inherently unencrypted and visible in the browser's address bar. Information is passed to the server through parameters appended to the URL as a query string (e.g., example.com/search?query=keyword).

36. Because GET requests transmit data in the open through the URL, any private information included, such as search terms, can be exposed. For example, when a consumer searches for medical symptoms or conditions on a website, those search terms can become part of the visible URL. When a user searches "privacy" on

Defendant's site, the resulting URL is "https://truecare.org/?s=privacy." When they search "mental health" it is "https://truecare.org/?s=mental+health."[6]

37. This means that any third parties monitoring the connection, including advertisers or analytics companies like Meta, can intercept and record the information and link it to a specific person using their FID. The inclusion of such sensitive data in GET requests creates a significant privacy risk, particularly when dealing with medical or other confidential information.

38. GET requests can simultaneously transmit data to multiple third-parties without the consumer's knowledge or consent. Through the use of tracking scripts (like Meta Pixel) and embedded links, a third party (like Meta) can intercept GET requests.

39. These third parties then collect, store, process and sell the sensitive information for their own commercial gain, effectively profiting from spying on the consumer's browsing activity.

40. A POST request is an HTTP method used to send larger amounts of data from the consumer to a server, often as part of a form submission or account interactions on a site.

41. POST requests are designed to transmit data in the body of the HTTP request rather than in the URL, which can offer better protection for sensitive information.

42. In the context of websites that deal with sensitive consumer information, such as healthcare or financial platforms, POST requests can carry private data including names, email addresses, medical history, or even insurance information. This information, if unencrypted, can be intercepted and accessed by third parties, leading to breaches of confidentiality.

43. POST requests can be configured to allow third-party entities (like Meta) to intercept the sensitive information being sent, without the consumer's awareness or consent.

[6] https://truecare.org/?s=mental+health

44. When a consumer enters sensitive health information on a website, they reasonably expect that the data will be handled confidentially and used only for its intended purpose. Both GET and POST requests, when intercepted by Meta using the Meta Pixel, create a scenario where the consumer's private communications are intercepted and obtained by Meta without consent.

45. In the digital age, where consumers increasingly rely on websites to access critical information and services, the integrity and confidentiality of their interactions must be protected.

46. The interception of GET and POST requests to learn private consumer traits, particularly sensitive medical information, without explicit consent or transparency, violates fundamental principles of privacy and consumer protection.

47. Such actions represent a grave breach of trust and privacy, as the transmitted data includes sensitive and personal medical information that should have been safeguarded by Defendant.

### 2. How Defendant Procured and Aided Meta with Intercepting Communications

48. Plaintiff and other Class Members visited Defendant's Website to search for information about personal health conditions.

49. Unbeknownst to Plaintiff and Class Members, Meta was tracking their activity the moment they accessed Defendant's Website, this includes the exact terms and words Plaintiff and Class Members searched on the Website.

50. Defendant embedded the Meta Pixel on its Website, which allowed Meta to intercept and record searches entered and "click" events when Plaintiff and Class Members clicked through to various pages. Click events show which page on the Website the person viewed as well as the selections they made from drop-down menus, such as those on Defendants site.[7]

[7] https://truecare.org/providers/

51. There is a tool that website developers use called “Meta Pixel Helper” which is “a Chrome Browser extension that runs in the background to automatically reviews websites for Meta Pixel code.”[8]

52. As demonstrated by the Meta Pixel Helper in the screenshot below from




Defendant’s site, Defendant installed the “Search” Pixel on its website.[9] This tracking mechanism enables Defendant to capture and record search terms entered by consumers, including the term “privacy,” as evidenced by the “search_string” field and the “Pixel Location” URL in the example above. These data points confirm that Defendant’s Pixel configuration actively monitors and transmits consumers’ search queries. The screenshot provides a detailed, close-up view and verification of the

---

[8] https://developers.facebook.com/docs/meta-pixel/support/pixel-helper/ - it says “reviews” on the site

[9] FACEBOOK, META FOR DEVELOPERS: META PIXEL https://developers.facebook.com/docs/meta-pixel/reference/

tracking activity.[10]

53. The screenshot below, extracted from the data analytics of Defendant's Website (truecare.org) in connection with the same search query described above, evidences a GET request intercepted by Meta aka Facebook containing the consumer-entered search term "privacy." This confirms that Defendant actively aids Meta to intercept user search queries.




54. Defendant embedded the Meta Pixel on its Website, which allowed Meta to intercept and record "search" events when Plaintiff and Class Members entered search terms on the Website. Search events were triggered when Plaintiff and Class Members utilized the search box on the Website.

55. Meta intercepts information, including the specific health condition Plaintiff and Class Members searched, along with a whole host of other personally identifying information, in order to uniquely identify the user and the device accessing Defendant's website.

56. By installing the Meta Pixel on the Website, Defendant assisted Meta with intercepting visitors' confidential information related to their medical needs in order to monetize that data for targeted advertising and other purposes.

---

[10] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/

57. These interceptions included a variety of personally identifying information which Meta utilized to identify their Facebook accounts for targeted advertising.

58. Meta intercepted the communications in real time, and while in transit, from Plaintiff's device to Defendant's server to fuel its targeted advertising service.

59. Plaintiff never consented, agreed, authorized, or otherwise permitted Meta to intercept her confidential health information.

60. By law, Plaintiff is entitled to privacy related to her protected health information and confidential communications.

61. Defendant deprived Plaintiff of her privacy rights when it implemented a system that helped Meta surreptitiously track and recorded Plaintiff's confidential communications, personally identifiable information, and protected health information.

### 3. Government Warning on Tracking Codes on Health Care Websites

62. The federal government has issued warnings that tracking codes like Meta Pixel may violate federal privacy law when installed on healthcare websites such as Defendant's.

63. The government warning titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022[11].

64. Healthcare organizations regulated under the Health Insurance Portability and Accountability Act (HIPAA) may not use website tools in a way that may expose patients' PHI to these vendors. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA

[11] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

> Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures***.

The bulletin then further discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI***. Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***.
>
> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***

Id. (footnotes omitted; bold italics added).

65. Plaintiff and Class Members face the very same kinds of risks that the government describes in this bulletin.

66. Defendant enabled Meta to learn the sensitive searches and pages that Plaintiff and Class Members visited on the Website.

67. This information is, as described by the OCR in its bulletin, "highly sensitive."

68. The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code***.
>
> Id. (footnotes omitted; bold italics added).

69. Crucially, that paragraph in the government's Bulletin continues:

> ***All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.*** This is because, ***when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care***.

Id. (footnotes omitted; bold italics added).

70. In July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to

> worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.
>
> In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.
>
> . . . Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a

> breach of security under the FTC's Health Breach Notification Rule . . .[12]

71. Defendant's conduct, with respect to its Website, is directly contrary to clear pronouncements by the FTC and HHS.

**B. PLAINTIFF'S ALLEGATIONS**

72. On or about February 14, 2023, September 8, 2023, September 12, 2023, October 18, 2023, November 1, 2023, and January 9, 2024, Plaintiff visited Defendant's Website. During the visits on October 18, 2023, November 1, 2023, and January 9, 2024, the Meta Pixel installed on the Website tracked Plaintiff's specific search terms entered on the Website.

73. Plaintiff downloaded her off-Facebook activity (depicted below) which evidences Plaintiff's interactions with the website.

SCREEN SHOT ON NEXT PAGE

///
///
///
///
///
///
///
///
///
///
///

[12] https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking

2/12/25, 10:09 AM truecare.org

**truecare.org**

Generated by Amy Wright on Friday, December 6, 2024 at 5:30 PM UTC-08:00
Contains data you requested from June 9, 2024 at 12:00 AM to December 5, 2024 at 12:00 AM

**truecare.org**

Events

| | |
|---|---|
| ID | 989293208473618 |
| Event | SEARCH |
| Received on | Jan 09, 2024 3:26:00 pm |

| | |
|---|---|
| ID | 989293208473618 |
| Event | SEARCH |
| Received on | Nov 01, 2023 3:42:00 pm |

| | |
|---|---|
| ID | 989293208473618 |
| Event | SEARCH |
| Received on | Oct 18, 2023 11:19:00 am |

| | |
|---|---|
| ID | 989293208473618 |
| Event | CONTACT |
| Received on | Sep 12, 2023 1:12:00 pm |

| | |
|---|---|
| ID | 989293208473618 |
| Event | PAGE_VIEW |
| Received on | Sep 08, 2023 1:54:00 pm |

| | |
|---|---|
| ID | 989293208473618 |
| Event | PAGE_VIEW |
| Received on | Feb 14, 2023 2:01:00 pm |

74. Plaintiff values her privacy while web-browsing especially regarding her health.

75. The pages Plaintiff visited constitute personal information of a private and confidential nature and are assets to which no third party has a right to access.

76. Due to the surreptitious nature of the Meta Pixel that Defendant installed on its Website, Plaintiff was completely unaware that Meta was involved and acting as a third-party eavesdropper, collecting personally identifiable information about Plaintiff.

///

## CLASS ACTION ALLEGATIONS

77. Plaintiff brings this action pursuant to Rule 23 of the Federal Rule of Civil Procedure, on behalf of a class defined as;

> "All natural persons in the United States who, during the Class Period, visited the Defendant's Website" (the "Class").

78. Plaintiff also brings this action on behalf of individuals located in California with a subclass defined as;

> "All natural persons in California who, during the Class Period, visited the Website (the "California Subclass") (together with the Class, the "Classes").

79. The "Class Period" is the time beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

80. Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

81. Excluded from the Classes are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

82. **Numerosity**. Members of the Classes are so numerous that joinder of all members is impracticable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records.

83. **Typicality**. Plaintiff's claims are typical of the claims of the Classes because Plaintiff used the Website to search, research and review sensitive health

conditions and had her personally identifiable information and protected health information accessed by Meta without her express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

84. **Adequacy**. Plaintiff is prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

85. **Commonality and Predominance**. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

a. Whether Defendant procured and/or aided Meta to tap the lines of internet communication between visitors to the Website and Defendant;

b. Whether Defendant used a "pen register" to record or decode addressing or signaling information of Class Members;

c. Whether Defendant "trapped and traced" Website visitor information and whether that information was reasonably likely to identify Class Members as the source of the communications;

d. Whether Defendant aided Meta to surreptitiously record personally identifiable information, protected health information, and related communications.;

e. Whether Meta is a third-party eavesdropper;

///

f. Whether the GET and POST requests that Meta intercepted constitute "communications;"

g. Whether Defendant's conduct was a breach of confidentiality;

h. Whether Defendant violated Plaintiff's and Class Members' privacy rights by installing the Meta Pixel to enable Meta to intercept and record their confidential medical communications;

i. Whether Defendant failed to safeguard the confidentiality of Class Members' medical information;

j. Whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA, the CMIA or any other relevant statute; and

k. Whether Defendant's actions violated Class Members' privacy rights.

86. **Superiority**. Class action treatment is the superior method for the fair and efficient adjudication of this controversy. Such treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)

87. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Nationwide Class.

///

88. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the contents of any electronic communication. 18 U.S.C. § 2511.

89. The ECPA protects both the sending and receiving of various types of communications.

90. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

91. Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

92. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

93. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

94. An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

///

///

95. Plaintiff's and Class Members' interactions with Defendant's website, and their online communications with Defendant are electronic communications under the ECPA.

96. Defendant, having the desire to secretly give Meta access to Class Member information, procured Meta to surreptitiously intercept Class Members' communications with its Website.

97. Each time Plaintiff and the Class Members engaged with Defendant's Website, Meta contemporaneously, and without authorization or consent, intercepted their electronic communications.

98. Plaintiff and Class Members did not authorize Meta to acquire the content of their communications.

99. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State" under 18 U.S.C. § 2511(2)(d).

100. The communications at issue here were intercepted for purposes of committing criminal and tortious acts in violation of the laws of the United States and of California, including, but not limited to:

a. Violation of HIPAA, 42 U.S.C. § 1320d-6;
b. Violation of California's Constitution, Art. 1, § 1;
c. Knowing intrusion upon Plaintiffs' and Class Members' seclusion;
d. Violation of 15 U.S.C. § 45;
e. Violation of the California Consumer Legal Remedies Act;
f. Violation of Cal. Penal Code § for statutory larceny;
g. Violation of the federal wire fraud statutes at 18 U.S.C. §§ 1343 and 1349;
h. Violation California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502;

///

i. Violation of California's Online Privacy Protection Act, Cal. Bus. & Prof. Code §§ 22575, et seq.;

j. Violation of Cal. Civil Code § 1798.82;

k. Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq;

l. Violation of the Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56.06, 56.10, 56.101;

m. Violation of the California Invasion of Privacy Act, Cal. Penal Code Sections 631

n. Violation of the California Invasion of Privacy Act, Cal. Penal Code Sections 638.51;

101. Defendant knew or had reason to know that its use of the Meta Pixel would cause Plaintiff and Class Members to suffer a loss, including:

a. The diminution in value of Plaintiff's and Class Members' information;

b. The loss of privacy due to Defendant making sensitive and confidential information that Plaintiff and Class Members intended to remain private no longer private.

102. Plaintiff, individually, on behalf of the Class Members, seeks all monetary and non-monetary relief allowed by law, including statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs including "the greater of $100 a day for each day of violation or $10,000" under 18 U.S.C. § 2520.

**<u>COUNT II</u>**

**Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631**

103. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

///

104. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Id. § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id*.

105. Cal. Penal Code § 631(a) generally prohibits individuals, businesses, and other legal entities from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to read, attempt to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or to use, or attempt to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

106. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." (*In re Google Inc*. (N.D. Cal. Sep. 26, 2013) 2013 WL 5423918, at *21; see also, e.g., *Shah v. Fandom, Inc*, (N.D. Cal. 2024) 754 F. Supp. 3d 924, 930 [finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"]; *Mirmalek v. Los Angeles Times Communications LLC* (N.D. Cal. Dec. 12, 2024) 2024 WL 5102709, at *3-4 [same]; *Lesh v. Cable News Network, Inc*. (S.D.N.Y. Feb. 20, 2025) --- F. Supp. 3d ---, 2025 WL 563358, at *3-5 [same]; *Moody v. C2 Educ. Sys. Inc*. [C.D. Cal. 2024] 742 F. Supp. 3d 1072, 1077 ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51.");

*Greenley v. Kochava, Inc.* (S.D. Cal. 2023) 684 F. Supp. 3d 1024, 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC* [9th Cir. May 31, 2022] 2022 WL 1744107, at *1 ["Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."].

107. Each alleged communication between Plaintiff or Subclass Members and Defendant constitutes a protected communication under CIPA, as the communications were made using personal computing devices—such as computers, smartphones, and tablets—that transmit and receive data, in whole or in part, through facilities used for the transmission of communications by wire, cable, or similar connections.

108. Defendant used the Meta Pixel to aid Meta to intercept communications without the consent of Plaintiff or Subclass Members.

109. At all relevant times, Defendant's aiding of Facebook to learn the contents of communications of was without authorization or consent.

110. Plaintiff and Subclass Members reasonably expected their communications with Defendant to remain confidential. Defendant neither sought nor obtained their consent to involve Meta. As a result, Defendant could not have received consent and no such consent was ever requested or given.

111. Defendant has engaged, and continues to engage, in enabling and assisting third parties—including Meta—to surreptitiously intercept the contents of Plaintiff's and Class Members' communications.

112. Defendant continues to aid in the interception of communications by facilitating the redirection of data exchanged between Subclass Members and Defendant. This intercepted data includes information identifying the parties involved, the existence of the communications, and their contents.

113. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of search queries;

c. Personally identifying information such as IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of communications;

e. The precise dates and times when consumers click links on Defendant's website; and

f. Information that Defendant sent back to consumers in response to search queries and requests for information;

114. The Meta Pixel employed by Defendant is designed to transmit each website user's actions to Meta simultaneously as the user initiated the communication. As a result, Subclass Members' communications were intercepted in transit to the intended recipient (Defendant) before reaching Defendant's servers.

115. By embedding the Pixel on its website, Defendant knowingly enabled Facebook to intercept and collect Subclass Members' communications. Furthermore, Defendant exercised full control over these tracking pixels, determining which webpages included them, what information was tracked and shared, and how events were categorized.

116. Plaintiff and the Subclass Members seek statutory damages of $5,000 per violation, as well as injunctive or other equitable relief under Cal. Penal Code § 637.2.

**<u>COUNT III</u>**

**Invasion of Privacy Under California's Constitution**

117. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

118. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution,

Article I, Section 1.

119. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

120. The right to privacy in California's constitution creates a right of action against private entities.

121. Plaintiff and Subclass Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and user data pursuant to Article I, Section I of the California Constitution.

122. Under the circumstances, Plaintiff and Subclass Members had a reasonable expectation of privacy, including that: (i) the data intercepted, collected, and used byt Meta encompassed personal, sensitive medical information, decisions, and diagnoses; and (ii) Plaintiff and Subclass Members neither consented to nor authorized Defendant to disclose this information to others or to collect and use it for their own financial benefit.

123. Plaintiff and Subclass Members reasonably expected that their communications, identity, health information, and treatment data would be kept confidential, and that Defendant would not secretly install wiretapping technology on its website to transmit these communications to third parties, including Facebook.

124. The disclosure of personally identifiable medical information significantly and unreasonably interferes with the privacy rights of Plaintiff and Subclass Members.

125. At the time of disclosure, Plaintiff and Subclass Members neither consented to, authorized, nor were aware of Defendant's sharing of their personal information and communications with Facebook. They never agreed to the collection, use, or monetization of their sensitive medical information by Facebook.

///

126. Plaintiff and Subclass Members have suffered harm and injury, including the invasion of their privacy rights. Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages: Sensitive and confidential information that Plaintiff and Class Members intended to keep private has been compromised, undermining the fundamental confidentiality of the relationship. Defendant enabled Meta to wrongfully take valuable personal information from Plaintiff and Subclass Members without their knowledge or consent, profiting from it while failing to share any benefits. As a result, Plaintiff and Subclass Members did not receive the full value of the services sought, which included Defendant's obligation to maintain confidentiality. Moreover, Defendant's actions have diminished the value of Plaintiff's and Class Members' personal information.

127. Accordingly, Plaintiff and Subclass Members seek all relief available for invasion of privacy claims under California's Constitution

**COUNT IV**

**Use of a Pen Register and/or Trap and Trace Device**

**Cal. Penal Code § 638.51**

128. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

129. California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

130. California Penal Code Section 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

131. California Penal Code Section 638.51 prohibits any person from using a pen register or trap and trace device without a court order.

132. Defendant's use of the Meta Pixel constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff's and Subclass Members' FID, location data and other sensitive personal information—from the electronic communications transmitted by their computers.

133. It also constitutes a "trap and trace device" because it is a device or process that is "reasonably likely to identify the source of a wire or electronic communication" by linking the communications to Plaintiff's FID.

134. Plaintiff and the Subclass Members seek statutory damages of $5,000 per violation, as well as injunctive or other equitable relief under Cal. Penal Code § 637.2.

**COUNT V**

**Violation of the Confidentiality of Medical Information Act**

**Cal. Civil Code §§ 56.06, 56.10, 56.101**

135. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

136. Defendant is a provider of health care under Cal. Civ. Code § 56.06, subdivision (a) and (b), because it maintains medical data and offers information to consumers that is for the diagnosis, treatment, or management of a medical conditions.

137. Defendant is therefore subject to the requirements of the CMIA and obligated under subdivision (d) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information.

138. Defendant breached Civil Code section 56.06 by failing to safeguard the confidentiality of users' medical information, instead allowing Meta to access the medical information of Plaintiff and Subclass Members without authorization.

139. Civil Code § 56.10, subdivision (a), prohibits a health care provider from

disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

140. Cal. Civil Code § 56.101, subdivision (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

141. Any health care provider who negligently creates, maintains, preservers, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36.

142. As detailed above, Defendant deliberately aided Meta to access personally identifying information—including names, phone numbers, email addresses, device identifiers, IP addresses, web URLs, Facebook IDs, and similar data—alongside health-related details such as appointments, medical conditions, diagnoses, patient history, and medical records. Under the CMIA, this combination of identifying and medical information qualifies as confidential information.

143. Defendant, either knowingly and willfully or through negligence, enabled Meta to access medical information without obtaining consent. Fully aware that Facebook would intercept all data entered on their website, Defendant nonetheless intentionally installed the Meta Pixel. By deliberately exposing patients' personal health information to Facebook, Defendant enabled Meta to improperly access and review the personal health information of Plaintiff and the California Subclass Members.

144. Plaintiff and the Subclass Members seek punitive damages of $3,000 each plus $1,000 each for attorney fees plus costs under Cal. Civil Code § 56.35.

145. Alternatively, they seek $1,000 each in nominal damages under Cal. Civil Code § 56.36(b)(1).

///

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For a determination that this action is a proper class action;
b. For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;
c. For an order declaring that Defendant's conduct violates the statutes referenced herein;
d. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;
e. An award of statutory damages to the extent available;
f. For punitive damages, as warranted, in an amount to be determined at trial;
g. For prejudgment interest on all amounts awarded;
h. For injunctive relief as pleaded or as the Court may deem proper; and
i. For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and costs.

## JURY TRIAL DEMANDED

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs and Class Members are entitled to, and demand, a trial by jury.

Respectfully submitted,

**Swigart Law Group**

Date: August 14, 2025

By: *s/ Joshua Swigart*
Joshua B. Swigart
Josh@SwigartLawGroup.com

Date: August 14, 2025

**Shay Legal, APC**

By: *s/ Daniel Shay*
Daniel G. Shay
Dan@ShayLegal.com

Attorneys for Plaintiff
and the Putative Class